IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **RONALD D. POTTS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **Civil No. 14-cv-964-CJP**[1] |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social** ) | |
| **Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Ronald D. Potts seeks judicial review of the final agency decision denying him Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in April 2011, alleging disability beginning on February 26, 2011. (Tr. 19). After holding an evidentiary hearing, ALJ Mary F. Withum denied the application for benefits in a decision dated April 16, 2013. (Tr. 19-28). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ failed to adequately consider all of plaintiff's impairments.

2. The assessment of plaintiff's credibility was legally insufficient.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 14.

## **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520. Under this procedure, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Mr. Potts was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d

1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Withum followed the five-step analytical framework described above. She found that plaintiff was insured for DIB only through June 30, 2012, and that he had not engaged in substantial gainful activity since the alleged date of onset. She found that plaintiff had severe impairments of degenerative joint disease of both knees; degenerative disc disease of the cervical spine, status post fusion; degenerative joint disease of the left shoulder; COPD; and obesity. She further determined that these impairments did not meet or equal a listed impairment.

The ALJ found that Mr. Potts' allegations about his impairments and limitations were not credible. She determined that, as of his date last insured, he had the residual functional capacity (RFC) to perform work at the light exertional level, with the following limitations: sit/stand option, provided that he is not off-task for more than 5% of the work period; no pushing or pulling; no climbing of ladders, ropes or scaffolding; only occasional stooping, crouching, kneeling and crawling; only frequent reaching with the left upper extremity; no concentrated exposure to environmental irritants and unprotected heights. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to perform his past work. However, he was not disabled because he was able to do other jobs which exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record

is directed to the points raised by plaintiff.

    **1.    Agency Forms**

Plaintiff was born in 1962, and was 48 years old on the alleged onset date of February 26, 2011.  (Tr. 143).  He graduated from high school.  (Tr. 147).

He indicated that he was unable to work because of a number of problems including neck and back injuries, cartilage loss in both knees, COPD, torn cartilage in his right shoulder and blackouts.  He was 6' tall and weighed 330 pounds.  (Tr. 146).

Plaintiff had worked as a carpenter and as a truck driver.  (Tr. 147).

Mr. Potts submitted a Function Report in June 2011.  He said that his neck, back, shoulder and knee conditions made it difficult to stand, lift, bend, reach or grasp, and that she had seizures or blackouts.  (Tr. 165).  He tried to do some odd jobs that did not require "hard labor" to earn some money.  His wife was confined to a wheelchair and sometimes needed help with chores.  (Tr. 166).  He took out the trash and, once in a while, made a sandwich.  His friend mowed his lawn.  (Tr. 167-168).

    **2.    Evidentiary Hearing**

Mr. Potts was represented by an attorney at the evidentiary hearing on March 8, 2013.  (Tr. 40).

Plaintiff testified that his wife was confined to a wheelchair and was on disability.  He helped her around the house, but he could not do much.  He said that their house "is a mess."  (Tr. 45).

Plaintiff received medical care at a VA Medical Center.  (Tr. 45).

Mr. Potts testified that he was unable to work because of his back and legs.  He could not concentrate or focus because of his medication.  On a typical day, he

did not do much except watch TV and nap.  He took laundry out of the washing machine because his wife could not.  (Tr. 50-51).

Mr. Potts testified that he could walk less than a block and he had to use a motorized cart in Wal-Mart.  He could stand for only 10 minutes.  He could not stoop, kneel, crouch or crawl.  His fingers and thumbs were numb.  He could sit for about 15 minutes.  He could lift 5 to 8 pounds.  (Tr. 58-61).

Plaintiff had pain in his knees.  The doctor gave him injections, which helped but did not relieve his pain completely.  The doctor at the VA had talked about replacing his knees, but they want to wait until he is in his 50's.  (Tr. 61-62).

Plaintiff weighed 395 pounds.  He had tried some weight loss programs through the VA, without success.  His doctor had talked about doing gastric bypass surgery.  (Tr. 52-53).

He also had asthma and COPD.  He had stopped smoking, which helped, but his breathing was "still bad."  He used a CPAP machine, but it was very difficult to get used to.  He did not sleep well.  His pain medications made him groggy and he could not concentrate.  (Tr. 54-55).

Plaintiff testified that he did not sleep well at night, and he had to take a nap in the morning and another nap in the afternoon.  He usually slept for a couple of hours after he took his pain medication.  (Tr. 65).

The ALJ questioned him about an emergency room visit in 2012 for a lawn mower accident.  He testified that he did not usually mow the grass.  He explained that the county had cited him because his grass was too long.  He had no one to mow it and no money to pay anyone, so he took an extra dose of pain medication and tried to mow it himself.  He flipped the riding mower over.  (Tr. 57-58).

A vocational expert (VE) also testified.  The ALJ asked him a hypothetical

question which comported with the ultimate RFC findings, set forth above.  The VE testified that this person could not do plaintiff's past work, but he could do other jobs that exist in significant numbers in the regional and national economies. Such jobs include assembly machine tender, inspector and hand packager, and injection molding machine tender.  (Tr. 67-71).

### 3.  Medical Treatment

Mr. Potts received all of his medical treatment from a Veterans' Administration Medical Center in St. Louis, Missouri.

In November 2010, plaintiff underwent a fusion and discectomy at C5-6 and C6-7.  (Tr. 490-491).  In January 2011, the pain radiating down his arms was better, but he still had numbness in his fingers.  He had "severe back pain" and could not walk far.  On exam, he had pain on rotation of the shoulders, worse on the right.  Straight leg raising caused back pain at 60 degrees.  He was released to return to work with limitations.  (Tr. 334).

He was seen in the neurosurgery clinic on February 7, 2011.  He still had some numbness in his arms following the cervical spine surgery, but his main complaint was low back pain and pain down his left thigh.  He felt he could no longer drive a truck and was going to apply for disability.  On exam, he had decreased sensation to touch in the right fingers.  On straight leg raising, he had back spasms and pain down the posterior thigh at 45 degrees.  The doctor wrote that plaintiff would not benefit much from discectomy, and he recommended weight loss, physical therapy and adding Flexeril to his pain medications.  The doctor also wrote that he "agree[d] with applying for disability."  (Tr. 328).  He weighed 336.8 pounds.  (Tr. 330).

The alleged date of onset of disability is February 26, 2011.

In March 2011, plaintiff was seen for evaluation of his knees. The diagnosis was degenerative joint disease in both knees. His knees were injected with Synvisc One. (Tr. 324-326).

In May 2011, plaintiff saw an orthopedic surgeon for right shoulder pain. He had full strength and a full range of motion. The doctor suspected a rotator cuff tear and prescribed physical therapy. (Tr. 242-243). An x-ray was normal and showed no arthritic changes. (Tr. 640).

In August 2011, plaintiff complained that his joint pain was worse. He thought this due to increased exercise as he was trying to lose weight. (Tr. 584).

Plaintiff was seen again for knee pain in September 2011. His left knee was more painful than the right and occasionally gave way. On exam, he had no effusion or crepitus. MRI showed a small subchondral lesion in the medical femur condyle on the right, and mild patellar and lateral arthritis on the left. Both knees were injected. The doctor advised that he was not a candidate for total knee replacement. (Tr. 571-572).

A medication list dated October 1, 2011, indicated that, among other medications, plaintiff was taking Hydrocodone/Acetaminophen, 1 to 2 tablets, every 6 hours for pain. (Tr. 567).

On October 3, 2011, it was noted that plaintiff had stopped smoking a month ago, and was gaining weight. He wanted to work on a weight loss program. (Tr. 652).

In January 2012, a primary care physician's assistant noted on physical exam that plaintiff's lungs had decreased volume exchange. He had stopped smoking five months earlier. (Tr. 864).

At a visit with an endocrinologist in February 2012, the doctor noted that

plaintiff had daytime sleepiness and that he fell asleep "while sitting daily." He had nonrestorative sleep with pain all night, and was "pending sleep study." He had daily pain in his neck and back and had been taking hydrocodone "for years." (Tr. 737). The doctor suspected that he suffered from obstructive sleep apnea. She also noted that plaintiff's ability to exercise more was limited by his arthritis. (Tr. 740).

X-rays of the lumbar spine in March 2012, showed a mild compression fracture deformity at T-12, with no evidence of arthritic changes. (Tr. 698). X-rays of both knees showed no fracture, dislocation or arthritic changes. (Tr. 699-700).

Ms. Potts' knees were again injected with Synvisc on March 12, 2012. The diagnosis was osteoarthritis in both knees. Mr. Potts also complained of low back pain. The orthopedic specialist indicated that his primary care physician would handle the "lumbar workup." (Tr. 856-857).

He was scheduled for a sleep study in May 2012, but the appointment was cancelled because of "staff shortage." (Tr. 743). A sleep study done in September 2012 showed moderate obstructive sleep apnea. (Tr. 743-744). A CPAP machine was prescribed for plaintiff in September 2012. (Tr. 724). Plaintiff received the machine on October 15, 2012. (Tr. 787).

Mr. Potts followed up for his knees in the orthopedic clinic at the VA Medical Center in September 2012. The doctor noted that he may have a component of joint degeneration as he had improvement in his symptoms with prior injections. He also noted that x-rays did not show substantial osteoarthritis, and that "his weight (380 pounds) plays significantly into his pain level." (Tr. 801-803).

On September 26, 2012, a doctor in the endocrinology clinic wrote that

plaintiff had extreme obesity and had "numerous co-morbidities due to his weight: DJD/OSA/HTN/Hypogonadism." His weight on that visit was 380 pounds. (Tr. 799-800).

An MRI of plaintiff's lumbar spine was done at an institution outside the VA Medical Center in December 2012. This study showed a left paracentral disc herniation at L4-5 which had "slightly progressed" and demonstrated an annular tear. There appeared to be nerve root impingement. (Tr. 874-875).

In February 2013, a doctor noted that plaintiff had "extreme obesity" and had "numerous co-morbidities due to his weight: DJD/OSA/HTN/Hypogonadism." (Tr. 748).

### 4. Consultative Examinations

On August 6, 2011, Dr. Vittal Chapa performed a consultative physical examination at the request of the agency. Mr. Potts was almost six feet tall and weighed 315 pounds. On exam, he had expiratory wheeze. He had decreased sensation to pinprick in the fourth and fifth fingers of both hands and lateral aspect of the left leg and anterior aspect of the left thigh. He had mild to moderate paravertebral muscle spasms. There was crepitation on palpation of the knee joints and plaintiff complained of pain on full range of motion of the knees. Dr. Chapa stated that the findings were consistent with osteoarthritis. The range of motion of both the cervical and lumbar spines was limited. Straight leg raising was negative. Plaintiff was unable to squat and arise and had severe difficulty walking on toes and heels. He was able to perform fine and gross manipulations with both hands, and his handgrip was full bilaterally. Among other diagnoses, Dr. Chapa noted chronic lumbosacral pain syndrome. (Tr. 499-515).

## Analysis

The Court first turns to plaintiff's challenge to the ALJ's credibility determination.

Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein. The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *3. "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ is required to give "specific reasons" for her credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid.* See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir., 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.")

As plaintiff points out, ALJ Withum expressed her credibility findings in the boilerplate language that was criticized in cases such as *Bjornson v. Astrue*, 671

F.3d 640, 644-645 (7th Cir. 2012), and *Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010). However, the use of the boilerplate language does not automatically require reversal. It is harmless where the ALJ goes on to support her conclusion with reasons derived from the evidence. See, *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir. 2012); *Richison v. Astrue*, 462 Fed. Appx. 622, 625-626 (7th Cir. 2012).

Here, the ALJ found that plaintiff was not credible because she perceived the medical evidence to be "relatively weak" and she thought that plaintiff's daily activities showed that he was not disabled. See, Tr. 25-26.

With regard to the medical treatment, the ALJ stated that plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual." (Tr. 25). Mr. Potts was treated with narcotic pain medications, repeated injections in his knees, a CPAP machine and weight-loss programs through the VA Medical Center. The ALJ did not give any hint as to what type of medical treatment she would expect a totally disabled person to receive. She did note that plaintiff was not a candidate for knee replacement surgery. Of course, there is no requirement that a person be a surgical candidate before they can qualify for social security disability. No medical expert opined that the treatment rendered to plaintiff was inappropriate. The ALJ's statement about the type of medical care received by Mr. Potts is not a valid reason to disbelieve his testimony. Further, an ALJ may not discredit plaintiff's testimony "solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009), citing SSR 96-7p.

The ALJ rejected plaintiff's description of "daily activities which are fairly limited" for two reasons. First, she observed that his allegedly limited activities

"cannot be objectively verified with any reasonable degree of certainty."  (Tr. 25). The Seventh Circuit has rejected this reasoning.  "Whatever uncertainty may exist around such self-reports is not by itself reason to discount them—otherwise, why ask in the first place?—and the relevant regulations specifically allow ALJs to consider claimants' 'daily activities.'"  *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).  There is, of course, no way to "objectively" verify plaintiff's report of his daily activities short of putting him under surveillance.  Further, the ALJ could have, but evidently did not, obtain statements from plaintiff's wife and other people who know him regarding his daily activities.

Secondly, the ALJ thought that the evidence suggested that plaintiff was capable of more than the limited activities he described.  She said that plaintiff "admitted" that he did "a significant amount of household chores because his wife is disabled and wheelchair bound."  She also pointed out that plaintiff mowed his lawn in June of 2012.  (Tr. 26).

There are several problems with the ALJ's consideration of plaintiff's daily activities.  First, the Seventh Circuit has noted that, while it is proper for the ALJ to consider a claimant's daily activities, the ALJ must exercise caution in equating an ability to perform daily activities with an ability to work full-time in a competitive employment situation.  *Beardsley v. Colvin*, 758 F.3d at 838.  This is especially true where the activity in question is "caring for a family member."  *Ibid.*  See also, *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time.")

Here, plaintiffs wife is confined to a wheelchair, and, of necessity, he pitches

in and does what he can around the house. He testified that he did laundry because his wife could not reach into the machine, took his wife to the store, and swept the kitchen floor. (Tr. 45, 51). He also stated on a form that he did "odd jobs for other people that doesn't [sic] require hard labor," made a sandwich "once in a while," and took out the trash. (Tr. 166-167). This hardly qualifies as an admission that he "does a significant amount of household chores." This is a very weak indication that plaintiff's testimony is not believable or that he is able to sustain full-time employment.

Secondly, the ALJ exaggerated the significance of the lawn mowing incident. Plaintiff testified that he tried to mow the lawn using a riding mower one time because the county was threatening to fine him. The attempt to mow the lawn was a near-disaster, as plaintiff flipped the mower over and had to go the emergency room. This incident cannot legitimately be viewed as evidence that plaintiff is capable of more than he is letting on.

In addition, the ALJ failed to consider plaintiff's allegations about side effects from his medications, as required by 20 C.F.R. §404.1529(c).

The erroneous credibility determination requires remand. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014), *Pierce,* 739 F.3d at 1051. Here, plaintiff's testimony is not incredible on its face, and it is clear that the decision depended in large part on plaintiff's credibility.

The Court also agrees that the ALJ failed to adequately consider all of plaintiff's impairments. The medical evidence establishes that plaintiff suffered from sleep apnea. His doctor noted that sleep apnea was likely responsible for his

daytime sleepiness. See, Tr. 737-740. The VE testified that a person who needed to rest upon demand or who was off-task for twenty percent of the workday would not be able to sustain full-time employment. See, Tr. 71. However, while the ALJ accepted that plaintiff had sleep apnea, she did not undertake any analysis of how sleep apnea affected his functioning. This was error.

Lastly, the ALJ's analysis of the effects of plaintiff's obesity is also lacking. Doctors at the VA Medical Center noted several times that plaintiff's obesity affected his knee pain, and that he had "co-morbidities due to his weight," including osteoarthritis and sleep apnea. Some of these notes post-date the date last insured, but they are relevant in view of the chronic nature of plaintiff's impairments. *Bjornson v. Astrue*, 671 F.3d 640, 642 (7th Cir. 2012).

The ALJ acknowledged that she was required to consider the effects of plaintiff's obesity in light of the guidance provided in SSR 02-1p. (Tr. 22). However, while she paid lip-service to this requirement, she failed to provide any meaningful analysis of the effects of plaintiff's obesity, despite the medical evidence.

The ALJ's errors require that this case be remanded for further proceedings. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Potts was disabled as of his date last insured or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Ronald D. Potts' application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to

sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   October 8, 2015.**

                                    **s/ Clifford J. Proud**
                                    **CLIFFORD J. PROUD**
                                    **UNITED STATES MAGISTRATE JUDGE**